OPINION
Georgetown of Kettering, Ltd. ("Georgetown") appeals from a decision of the Ohio Board of Tax Appeals ("BTA") which held that the sale price of four parcels of real estate was the best evidence of their true value as of January 1, 1997.
The record reveals that in March 1997, Georgetown paid $10,750,000 to purchase four abutting parcels of real estate located at 4889 Far Hills Avenue, Kettering, Ohio ("subject property"). The Georgetown of Kettering Apartment complex, which consisted of 325 brick units, was located on the subject property. Prior to the 1997 tax year, the true value of the subject property had been established at $8,428,880.
On March 31, 1998, the Board of Education of the Kettering-Moraine City Schools ("Board of Education") filed an "original complaint" in the Montgomery County Board of Revision ("Board of Revision") against Georgetown, alleging that there should be an increase in the true and taxable values of the subject property for the 1997 tax year. The Board of Education requested that the true value of the subject property be increased to $10,750,000 to reflect the March 1997 sale price. In June 1998, Georgetown filed a "counter-complaint" requesting that no change be made in the true value of the subject property for the 1997 tax year.
The Board of Revision held a hearing on July 31, 1998. On September 3, 1998, the Board of Revision issued its decision finding that the true value of the subject property should be increased to $9,250,100.
On October 2, 1998, the Board of Education filed a notice of appeal of the Board of Revision's decision to the BTA. The Board of Education claimed that the Board of Revision had erred in not raising the true value of the subject property to $10,750,000.
The BTA held a hearing on August 25, 1999. On February 18, 2000, the BTA determined that the $10,750,000 sale price of the subject property was the best evidence of its true value as of January 1, 1997. On March 20, 2000, Georgetown filed a notice of appeal of the BTA's decision.
Georgetown now presents three "issues for review" which we will address as assignments of error on appeal. The first and third assignments of error will be considered together because they are interrelated.
 I. WHETHER THE EXISTENCE OF UNIQUE FINANCING TERMS IN AN ACQUISITION OF REAL PROPERTY REBUT[S] THE PRESUMPTION THAT THE SALE PRICE IS THE TRUE VALUE IN MONEY OF THE PROPERTY ACQUIRED.
 III. WHETHER APPELLANT DEMONSTRATED THE VALUE OF THE SUBJECT PROPERTY ON JANUARY 1, 1997.
Georgetown argues that the BTA erred in concluding that the sale price of the subject property was the best evidence of its true value. Georgetown claims that it proved that the sale price was not reflective of the subject property's true value and that it demonstrated that a different amount was the appropriate true value.
"The [BTA] has wide discretion to determine the weight given to evidence and the credibility of witnesses before it." Meijer, Inc. v.Montgomery Cty. Bd. of Revision (1996), 75 Ohio St.3d 181, 185,661 N.E.2d 1056, 1060; Sherman v. Board of Tax Appeals (Mar. 9, 2000), Cuyahoga App. No. 75971, unreported. We are "not a super [BTA]" and thus we do "not sit as a trier of fact de novo." Simmons v. CuyahogaCty. Bd. of Revision (1998), 81 Ohio St.3d 47, 49, 689 N.E.2d 22, 24
(quotation omitted). We will reverse the BTA's true value decision only if "it firmly appears from the record that such decision is unreasonable or unlawful." Meijer, Inc., 75 Ohio St.3d at 185-186,661 N.E.2d at 1060; Sherman, supra; R.C. 5717.04.
R.C. 5713.01(B) requires that the county auditor view and appraise each parcel of real estate in the county at its true value. "In determining the true value of any * * * parcel of real estate * * *, if such * * * parcel has been the subject of an arm's length sale between a willing seller and a willing buyer within a reasonable length of time, either before or after the tax lien date, the auditor shall consider the sale price of such * * * parcel to be the true value for taxation purposes." R.C. 5713.03. The supreme court has "never adopted an absolutist interpretation of R.C. 5713.03[,]" but instead has held that where a parcel has been the subject of a recent arm's length sale, there is a presumption that the sale price is the best evidence of the true value of such parcel. Ratner v. Stark Cty. Bd. of Revision (1988),35 Ohio St.3d 26, 28, 517 N.E.2d 915, 917 ("Ratner II"). Such presumption may be rebutted, however, with evidence which indicates otherwise. Id.
Georgetown argues that it rebutted the presumption by proving that it had received "special financing terms" to purchase the subject property. Specifically, it points to four terms in the loan that it obtained to purchase the subject property: an "unusually small down payment"; "financing provided at rates substantially below those prevailing in the market at the time"; the "absence of any pre-payment penalty"; and financing for necessary deferred maintenance in the amount of the loan.
At the hearing before the BTA, Georgetown presented the testimonies of two witnesses. Georgetown's first witness was James Murphy, one of the two principals of the real estate investment firm which had created Georgetown to purchase the subject property and to manage the apartment buildings. Murphy testified that his investment firm was in the business of acquiring "underperforming assets," typically apartment buildings, restructuring those businesses, and holding them long-term for profit. He stated that when his firm acquires "underperforming assets," he and his partner do not "look at them as real estate" but instead "look at what [their] cash investment [is] going to be, and what kind of return [they] can * * * get."
Murphy stated that the purchase of the subject property had occurred in a two-step process which involved an "acquisition loan" and an "end loan." The acquisition loan was obtained through Bank One of Dayton, a local lender with whom his firm had developed a close relationship. Murphy testified that because of the close relationship, his firm had been able to get a loan that would not have been available to "other people." Georgetown purchased the subject property for $10,750,000 and borrowed $10,400,000 of that amount from Bank One at an interest rate of 8.1 percent. Of the $10,400,000 loan, $698,000 was set aside in escrow for deferred maintenance. The loan was for four years and had no penalty for prepayment . Murphy testified that these terms were unusual because at the time the loan had been acquired, the "going [interest] rate" had been 9 percent. He stated that he was aware of such rate because his banker had told him what a "great deal" Georgetown was getting when it obtained the loan and because his investment firm had received daily faxes on the interest rates for end loans. Murphy testified that although he was "not sure," he believed the difference between an interest rate of 8.1 percent and 9 percent on Georgetown's loan amounted to between $90,000 and $120,000 in interest charges per year. Murphy further stated that the lack of a prepayment penalty was unusual because "[e]very lender * * * puts in a prepayment penalty." Murphy also testified that at the time Georgetown had purchased the subject property, his firm's research had indicated that Georgetown could likely obtain an end loan with an interest rate of approximately 7 percent. On August 14, 1998, Georgetown obtained an end loan through The Chase Manhattan Bank. The loan was for $11,000,000 at an interest rate of 6.74 percent and was secured by the subject property.
Georgetown's second witness was Allan L. Johnston, Jr., the vice chairman of The Gem Real Estate Group and a state-certified general real estate appraiser. Johnston testified regarding an independent appraisal which he had completed on the subject property. Previously, at the Board of Revision hearing, Johnston had presented information regarding the sales of seven Dayton area properties with apartment complexes which he believed were similar to the subject property. He presented these seven sales again, along with information regarding five additional sales, to the BTA, with two of the additional sales being resales of properties originally listed in the first seven he had presented to the Board of Revision. Johnston compared different types of information from the sale of the subject property to the sales of the other properties, such as sale price, acreage, year built, square footage, number of apartment units, sale price per square foot, sale price per unit, effective gross income, effective gross income multiplier, expenses per square foot, expenses per unit, expense ratio, net operating income per square foot, net operating income per unit, net income multiplier, and overall rate. Of the original seven sales he had presented to the Board of Revision, six of the properties had been purchased by Murphy's firm. Johnston testified that the numbers regarding some of those properties had been obtained from Murphy and his staff.
Johnston's comparisons showed that the subject property was outside the ranges of numbers for the similar properties in almost every category of information. For example, in the sale price per unit category, the subject property cost $33,077 per unit whereas the other properties cost $23,465 to $29,167 per unit, with an average of $26,698 per unit. Based upon these comparisons, Johnston concluded that the subject property had "sold outside the range indicated by similar sales of reasonably like-sized propert[ies] within a [similar] time frame[.]" Johnston's appraisal stated that Georgetown's ability to secure an end loan at an interest rate of 6.74 percent would save Georgetown approximately $1,170,735 per year that other borrowers would have had to pay had they borrowed the same amount of money at the going interest rate of 9 percent.
Johnston discussed the "three traditional approaches" to market value to determine his final conclusion regarding the subject property's true value. Johnston stated that he had not evaluated the subject property under the cost approach because such analysis would have been "only of tertiary significance" due to the advanced age of the apartment complexes on the subject property. Under the income approach, Johnston concluded that the true value of the subject property was between $8,870, 978 and $8,881,265. Under the sales comparison approach, Johnston concluded that the true value of the subject property was between $8,869, 283 and $8,894,832. After rounding the values from the two different approaches, Johnston concluded that the true value of the subject property was $8,880,000.In its decision, the BTA carefully reviewed the evidence presented by Georgetown, but then stated that such evidence had not rebutted the presumption that the sale price paid in the arm's length sale was the best evidence of the subject property's true value because such evidence had left the BTA "unconvinced[.]" The BTA noted that the only evidence that had been presented to show that Georgetown's interest rate had not been market-driven had been "Murphy's self-serving testimony[.]" The BTA pointed out that the real estate purchase agreement for the subject property had not conditioned the sale upon Georgetown's ability to obtain financing at a specific interest rate.
The BTA stated that it had placed "little weight" on Johnston's conclusions for the following reasons: Johnston had compared the rates of a local lender to the rates offered by a national institutional lender, Johnston had used the end loan financing rate instead of the acquisition loan financing rate in his comparisons, Johnston had failed to provide adequate information to allow the BTA to make specific conclusions as to the comparability of the other properties to the subject property, and Johnston's appraisal had been "based upon general conclusions as to the Dayton marketplace (and weighted more specifically to [Murphy's] preferences in making real property purchases)." The BTA also stated that it had been "concerned" because two appraisals of the subject property had taken place, one at the time of Georgetown's purchase and another at the time of Georgetown's end loan, but that the amounts of such appraisals had not been disclosed to the BTA. The BTA found the lack of disclosure to be "especially troubling" because the end loan, which was secured by the subject property, had been for $11,000,000, $250,000 more than the sale price Georgetown had paid for the subject property. Based upon the nondisclosure of the appraisal amounts, the BTA concluded that it was "reasonable to infer that the appraisals prepared [for both loans] support[ed], at the very least, the amounts for which the [subject] property [had been] financed."
Georgetown relies on Ratner v. Stark Cty. Bd. of Revision (1986),23 Ohio St.3d 59, 60, 491 N.E.2d 680, 681 ("Ratner I") to support its argument. In that case, a taxpayer purchased improved real estate for $12,540,500. Id. at 59, 491 N.E.2d at 680. His payment consisted of $500,000 in cash, a $6,000,000 note, and the assumption of a $6,040,500 mortgage with interest rates ranging from 5.75 percent to 9 percent. Id.
The county auditor determined that the true value of the property was $15,899,710. Id. After the taxpayer filed a property valuation complaint, the county board of revision held that the true value of the property was $12,530,000. Id. at 59, 491 N.E.2d at 681. On appeal to the BTA, the taxpayer presented two appraisals of the property, one which concluded that the cash equivalent sale price of the property was $10,480,000 and another which concluded that the fair market value of the property was $10,390,000. Id. at 60, 491 N.E.2d at 681. The BTA determined that the sale price of the property, $12,540,500, reflected the property's true value. Id. The supreme court reversed the BTA's decision, finding that the BTA had incorrectly interpreted one of the supreme court's previous cases to compel a holding that true value was synonymous with sale price. Id. The supreme court stated, "[a]lthough the sale price is the `best evidence' of true value of real property for tax purposes, it is not the only evidence. A review of independent appraisals based upon factors other than the sale price is appropriate where it is shown that the sale price does not reflect true value." Id.
at syllabus. The court further stated that specific transaction prices, including financing terms, should be examined to determine whether the sale price reflected market value. Id. at 61, 491 N.E.2d at 682. The court concluded, "[i]n determining true value for property, * * * the BTA must at least consider and review evidence presented by independent real estate appraisers that adjusts the contract sale price to reflect both the price paid for real estate and the price paid for favorable financing." (Emphasis added.) Id. at 62, 491 N.E.2d at 682. InRatner II, the supreme court emphasized that in Ratner I, it had not dictated that the BTA must give total acceptance to the cash equivalency analysis, but that it at least must consider and review this evidence.Ratner II, 35 Ohio St.3d at 29-30, 517 N.E.2d at 918. Georgetown argues that the facts of its case are similar to the facts in Ratner I
and II and thus that the BTA erred because it "completely ignored" Georgetown's evidence of favorable financing. Georgetown claims that because the BTA did not consider these factors, its decision was unreasonable and unlawful.
We do not agree with Georgetown's argument. The BTA's decision comprehensively reviewed the testimonies of Murphy and Johnston and noted the various favorable financing factors which Georgetown argued had demonstrated that the sale price was not the best evidence of the true value of the subject property. The BTA's failure to be convinced by the testimonies of Murphy and Johnston does not mean that it did not consider them. Ratner I and II made it clear that the BTA does not have to give total acceptance to a taxpayer's appraisal evidence, but instead merely needs to consider and review such evidence. See, also, Walters v.Knox Cty. Bd. of Revision (1989), 47 Ohio St.3d 23, 24-25, 546 N.E.2d 932,934. It is clear from the BTA's decision that it did consider and review the testimonies of Murphy and Johnston and Johnston's appraisal, but that it declined to totally accept such evidence because it found it to be unconvincing. Based upon our independent review of the record, we cannot say that the BTA's decision was unreasonable or unlawful.
The first and third assignments of error are overruled.
 II. WHETHER THE SALES PRICE IS THE BEST EVIDENCE OF THE TRUE VALUE IN MONEY OF REAL PROPERTY WHERE THE ACQUISITION OF TANGIBLE PERSONAL PROPERTY, ITEMIZED IN THE PURCHASE AGREEMENT, IS ALSO SPECIFICALLY INCLUDED IN THE LUMP-SUM PRICE PAID.
Georgetown argues that the BTA erred in determining that the true value of the subject property was its sale price because a portion of the sale price was for tangible personal property, such as furniture and machinery, which was included in the sale of the subject property. Georgetown argues that the BTA should have subtracted the value of the personal property from the sale price before concluding that such price was the best evidence of the subject property's true value.
Georgetown failed to raise this argument to the Board of Revision and the BTA. During oral argument before our court, the Board of Education agreed that in order to determine the true value of the subject property, the BTA should have subtracted the value of the tangible personal property from the sale price. Georgetown admitted, however, that the value of the tangible personal property had not been established in the proceedings before the BTA. The Board of Education stated that it believed that substantial justice would be done if the value of the tangible personal property was subtracted from the sale price, if Georgetown was able to prove the amount of such property. The Board of Education further stated that it would not have objected to the deduction of the amount of the tangible personal property from the sale price had Georgetown raised that argument below.
We agree that substantial justice requires that the value of the tangible personal property be deducted from the sale price for a determination of the true value of the subject property. We note that such a reduction is important because the true value of the subject property could impact the true value of other similar parcels in the future when they are compared to the subject property for a determination of their true values. The true value of the subject property should be established at the most accurate amount possible and thus the value of the tangible personal property included in the sale should be excluded from the sale price before such sale price is classified as the true value of the subject property.
The second assignment of error is sustained. This case is remanded to the BTA for a determination of the value of the tangible personal property that was involved in the sale of the subject property. Such amount shall be deducted from the sale price and the remaining amount shall be determined to be the true value of the subject property.
The judgment of the trial court will be affirmed in part, reversed in part, and remanded for further proceedings.
 ________________________ WOLFF, J.
FAIN, J. and YOUNG, J., concur.